**FIDELITY NAT. BANK & TRUST CO. OF KANSAS CITY v. McNEAL.**

**No. 744.**

District Court, N. D. Oklahoma.
Jan. 10, 1933.

Bowersock, Fizzell & Rhodes, of Kansas City, Mo., and Harper & Lee, of Tulsa, Okl., for plaintiff.

Powell Clayton and G. G. Hilford, both of Tulsa, Okl., for defendant.

FRANKLIN E. KENNAMER, District Judge.

The Fidelity National Bank & Trust Company of Missouri, with its principal place of business in the city of Kansas City, Mo., instituted this action against P. A. Mc-Neal to recover certain special tax bills and coupons thereto attached, of the value of more than $3,000.

The pleadings and evidence herein disclose that the special tax bills and coupons in controversy were originally issued by the city of Tulsa to the Standard Paving Company during the year 1924, for paving and doing the necessary street improvement in the districts mentioned in said special tax bills and coupons. The special tax bills and coupons were made liens against the property improved to secure the payment therefor. The tax bills and coupons are not the obligations of the city of Tulsa, but are special assessments against the property improved from the proceeds of said bills. The special tax bills and coupons in question are in form like others issued by the city of Tulsa, and are regarded, in the matter of sale, as negotiable, in that title is passed to the purchaser upon delivery. When coupons are paid, or when entire tax bills are paid, the commissioner of finance and revenue of the city of Tulsa, the duly authorized agent of the city of Tulsa to collect the same, requires only the presentation and surrender of the coupons to receive funds applicable thereto.

After the issuance and delivery of the special tax bills and coupons in question by the city of Tulsa to the Standard Paving Company, said special tax bills and coupons were sold and transferred by the Standard Paving Company to the Hanchett Bond Company of Chicago, Ill., and the Standard Paving Company, through its appropriate officers, indorsed and signed upon the backs of said tax bills an assignment as follows:

"For value received this Special Tax Bill and the lien thereof is hereby assigned to ———— who will receipt for payment of same. Dated ————

"Standard Paving Company
"H. V. Gray."

The Hanchett Bond Company was a corporation engaged in the business of buying, selling, and dealing in municipal securities of various kinds and character, including special tax bills and coupons of the city of Tulsa, similar to the ones here in controversy. The Hanchett Bond Company in turn sold and assigned the special tax bills and coupons to the Municipal Securities Corporation of Chicago, which was also a corporation engaged in the business of buying, selling, and dealing in municipal securities including special tax bills and coupons of the city of Tulsa, similar to those here in controversy. The officers, directors, and stockholders of the Hanchett Bond Company and of the Municipal Securities Corporation of Chicago were virtually the same; one William F. Hanchett was president of both corporations, and dominated both the Hanchett Bond Company and the Municipal Securities Corporation of Chicago. Both corporations transacted business in the same office, through the same employees, and the evidence indicates that the major portion of the business of the Municipal Securities Corporation of Chicago was conducted with the public upon the stationery of the Hanchett Bond Company and under the name of the Hanchett Bond Company.

On December 19, 1928, the Municipal Securities Corporation of Chicago entered into a written indenture of trust with the Fidelity National Bank & Trust Company of Kansas City, Mo., whereby municipal securities owned by the Municipal Securities Corporation of Chicago could be delivered to the Fidelity National Bank & Trust Company in trust, for the purpose, among other things, to secure the 5 per cent. collateral trust gold bonds of the Municipal Securities Corporation. The indenture provided for the issuance and authentication by the Fidelity National Bank & Trust Company, trustee, from time to time of various series of said bonds of the Municipal Securities Corporation of Chicago to be secured by underlying municipal bonds and securities including special tax bills and coupons of the kind and character in controversy, which underlying bonds were to be held in trust on the terms and conditions and for the purposes set forth in said indenture of trust. The Municipal Securities Corporation would purchase from the Hanchett

508

Bond Company special tax bills and coupons of the city of Tulsa, and would pay therefor by issuing and delivering to the Hanchett Bond Company its 5 per cent. collateral trust gold bonds, duly authenticated and certified to by the Fidelity National Bank & Trust Company, trustee. The Hanchett Bond Company would then sell to the public the 5 per cent. collateral trust gold bonds, so issued and authenticated by the trustee. The special tax bills and coupons of the city of Tulsa here involved were delivered to the Fidelity National Bank & Trust Company under the indenture of trust to secure a series of the 5 per cent. collateral trust gold bonds.

The provisions of the indenture of trust pertinent to this controversy are:

Article 11 of this indenture provides: "If any security is by its terms payable to a designated payee, it shall be appropriately indorsed or assigned so as to be payable to the Trustee or to bearer."

Section 1 of article V provides: "So long as there shall have been no default by the Company hereunder, or under said collateral trust gold bonds or coupons, the Company shall be entitled to receive from the Trustee, and the Trustee shall deliver to the Company, without requiring substitutes therefore, at any time, on written demand of the Company, for the purpose of collection or for suit to collect any of said securities or their coupons whether such coupons represent interest, or interest and principal which may be past due or which may become due within thirty days; but such securities and coupons so delivered and received and their proceeds shall be held in trust by the Company for the benefit of the holders of bonds secured hereby, and, so long as said bonds or coupons so secured shall remain unpaid, no part of such proceeds shall ever be applied except to the payment of said bonds or the interest thereon. The Trustee shall not be responsible for any failure of the Company to account for any such securities so delivered to it. Whenever requested by the Company, and to the end that they may be paid in advance of maturity the trustee shall cause any of said securities to be presented for payment at the place specified, although by their terms payment is not due but is optional with the property owner or party owing the indebtedness; and the Trustee shall collect all such securities when the maturity thereof is thus anticipated, and shall hold the proceeds in lieu of such securities, but shall pay over the same to the Company if other securities are substituted therefor as by the second paragraph of Article VIII hereof provided, the Trustee having received no notice of default hereunder."

The last paragraph of section 11, article V, provides: "The Trustee shall have no responsibility for anything done or suffered to be done by it under the provisions of this Article V."

Section 1 of article VII provides: "It is understood that said Trustee assumes no risk or obligation as to the securities deposited, either as to their genuineness, their validity, or any other matter respecting them, and shall be liable in no case for anything but bad faith in the execution of this trust. It shall be under no obligation to institute or prosecute any action unless first indemnified against the costs and expenses thereof by the bondholders desiring such action, and if, in any case, the pursuit of an extraordinary remedy should be demanded by bondholders, reasonable indemnity according to the exigencies of the case shall be furnished. The Trustee shall not be expected to take any steps toward the collection of said securities, even after default by the Company, save in presenting the same when due at the office of such official as shall by law be charged with the disbursement of the public money, or to the person, firm or corporation designated in the security as the payor thereof, and any further or additional effort on its part will be had only at the special instance of bondholders and upon due indemnity as aforesaid."

Section 111 of article VIII provides: "Not only shall any collection of said securities which come or may come under the operation hereof when collected by the Company be held for and on account of the Trustee as the proceeds of a special trust fund, but any suit which may be prosecuted and any judgment or decree which may be obtained by or in the name of the Company on or in connection with any such securities shall be deemed to be the property of the Trustee for the use and benefit of the bondholders hereunder, and may be enforced by the Trustee, this instrument operating as an assignment for that purpose."

The last sentence of section 1, article XI, provides: "The Trustee shall have no responsibility as to the validity of this instrument, nor as to the amount or extent of the security afforded by the property hereby conveyed, nor as to the validity of any bonds issued hereunder, nor as to the performance by the Company of any of its covenants or obligations hereunder."

Section 111 of article XI provides: "The Trustee may select and employ, in and about

the execution of any of the duties incumbent upon it hereunder, suitable agents and attorneys (including counsel for the Company) and it shall not be answerable for any act, default or misconduct of any such agent or attorney appointed by it in pursuance hereof if such agent or attorney shall have been selected with reasonable care; nor shall the Trustee be otherwise responsible or accountable under any circumstances whatsoever except for willful misconduct and willful negligence. The Trustee shall be under no obligation or duty to perform any act hereunder, or to defend any suit in respect hereof until indemnified to its satisfaction; nor shall it be required to take notice, nor be deemed to have notice or knowledge, of any default of the Company in respect to any of its covenants and agreements herein contained, unless the Trustee shall have been specifically notified of each default in writing by the holders of not less than five per centum in amount of the series then outstanding hereunder in respect of which the default complained of has occurred; nor shall the Trustee be bound to recognize any person as a bondholder unless or until his bonds are submitted to the Trustee for inspection, if required, and his title satisfactorily established, if disputed. In case at any time it shall be necessary or proper for the Trustee to make any investigation respecting any fact preparatory to taking or not taking any action, or doing or not doing anything as such Trustee except when it is specifically otherwise provided herein, a certificate signed in the Company's name by its President or by a Vice President, and attested by its Secretary, or by an assistant Secretary under its corporate seal, and verified by the affidavit of one or more of the Company's directors, shall be conclusive evidence of such fact to protect the Trustee in any action that it may take by reason of the supposed existence of such fact; but the Trustee may in its discretion, make such further examination or investigation with reference to such supposed fact as it may deem advisable, and the Company agrees to pay on demand all expenses reasonably incurred by the Trustee in making any such investigation or examination. Except as may be otherwise provided by this instrument, and unless and until there shall be delivered to the Trustee a certified copy of a resolution of the Company's Board of Directors determining otherwise, every request, order, consent or expression of desire set forth in writing, addressed and delivered to the Trustee and signed in the name of the Company by its President may, for every purpose of this instrument,

be taken and relied upon by the Trustee as the request, order, consent or expression of desire of the Company. The Trustee shall be protected in acting upon any notice, request, certificate, order, affidavit, letter, telegram or other paper or document believed by it to be genuine and correct and to have been signed or sent by the proper person or persons, and may, in the discharge of its duties hereunder, act upon the information or advice of any attorney, valuer, surveyor, engineer, accountant or other expert retained by it or by the Company, and shall not be responsible for any loss resulting from any action or nonaction in accordance with any such information or advice. Any notice to the Company under any provision of this instrument shall be sufficiently given if served personally upon any officer of the Company or deposited in the mails addressed to the Company at Chicago, Illinois."

Particular consideration must be given to the powers, duties, and obligations of the trustee under said trust, of the Municipal Securities Corporation of Chicago and of the holders of said 5 per cent. collateral trust gold bonds. The indenture of trust clearly evidences a deliberate plan to narrow and limit the duties and obligations of the trustee, and to permit the Municipal Securities Corporation of Chicago, the debtor, a very broad latitude of action; and particularly so in the withdrawal of securities deposited with said trustee. It is apparent from a reading of said declaration of trust that the name of the Fidelity National Bank & Trust Company and its standing as a national bank were to be its chief contribution in such a scheme, and not its duties as a trustee. For such duties as a trustee it received satisfactory compensation.

The last sentence of section 1 of article 11, and the provisions of article V, clearly disclose the intention upon the part of the Municipal Securities Corporation of Chicago, and the Fidelity National Bank & Trust Company of Kansas City, to perfect an arrangement whereby the Municipal Securities Corporation of Chicago could withdraw the securities deposited with the trustee, and to act, in so far as the city of Tulsa was concerned, the indebted property owners, and the public, as the owners of such special tax bills and coupons. The conduct of the trustee and the Municipal Securities Corporation of Chicago bear out this conclusion.

On or about October 30, 1931, the Municipal Securities Corporation of Chicago, through its president, William F. Hanchett, requested the special tax bills and coupons

here in question be delivered to it. The Fidelity National Bank & Trust Company, trustee, delivered special tax bills and coupons to the Municipal Securities Corporation of Chicago, taking from the Municipal Securities Corporation an instrument termed by the parties thereto as a "Trust Receipt." This receipt reads as follows:

"F-4

"Received from Fidelity National Bank and Trust Company, Trustee Series No. J-9 in trust for collection and remittance 10/30/31

"Memorandum Ordinance Number Inst. Amount

"Tulsa, Oklahoma List attached 1459.99

"Received from Fidelity National Bank and Trust Company this date, Securities listed hereon.

    "Municipal Securities Corpn.
      "By Robert Barrie
      "By D. Houston
"Total,
"[Signed] Municipal Securities Corporation of Chicago
    "By Wm. F. Hanchett, President."

The evidence shows that these special tax bills and coupons were not due at that time. From the face of the special tax bills and coupons they were not due for more than ten months after October 30, 1931. The evidence does not show that the owner of the property assessed, and upon which these special tax bills and coupons were liens, had anticipated the due date of said special tax bills and coupons by the payment thereof at the office of the commissioner of finance and revenue of the city of Tulsa. The evidence does not show that the commissioner of finance and revenue of the city of Tulsa had notified any one that the special tax bills and coupons had been paid or would be paid before the due date, and that he was holding funds for payment upon the presentation of said special tax bills and coupons. No proof was requested by the Fidelity National Bank & Trust Company of Kansas City from the Municipal Securities Corporation of Chicago, that the special tax bills and coupons had been anticipated by the property owners, or might be immediately paid. The Municipal Securities Corporation did not substitute other collateral for these special tax bills and coupons. The evidence clearly shows that it was the practice of the Fidelity National Bank & Trust Company to take at face value, without any investigation whatever, the representations of the Municipal Securities Corporation of Chicago as to whether or not the coupons were due, or might become due, within thirty days. The Fidelity National Bank & Trust Company was satisfied to formally and in a ministerial manner take the so-called trust receipt, and in that manner discharge to the public and to the bond holders of said 5 per cent. collateral trust gold bonds its duties as a trustee. After its acceptance of the so-called trust receipt, the Fidelity National Bank & Trust Company did not take those steps which a prudent person would have taken under the same circumstances to recover said tax bills and coupons. Apparently it was satisfied it had dispensed with its fiduciary duties by surrendering up to the debtor the collateral underlying the said 5 per cent. collateral trust gold bonds sold to the public.

■■ The evidence further shows that prior to the withdrawal of said special tax bills and coupons by the Municipal Securities Corporation of Chicago from the trustee, and in the early part of October, 1931, the Hanchett Bond Company was negotiating a sale of special tax bills and coupons of the city of Tulsa to P. A. McNeal, defendant, and said negotiations finally resulted in the sale of the tax bills and coupons under the direction of Mr. William F. Hanchett, president of the Municipal Securities Corporation, the dominating officer and stockholder thereof, and of the Hanchett Bond Company. The tax bills were sent with draft attached for an adequate consideration in favor of the Hanchett Bond Company, drawn upon P. A. McNeal, in care of the Exchange National Bank of Tulsa, Okl. The bank presented the draft to McNeal and after examination of said tax bills for the purpose of determining their condition he paid the draft. Funds were in due course and time remitted to the Hanchett Bond Company of Chicago. The evidence shows that McNeal at all times exercised that degree of care and caution in the transaction which an ordinary and reasonable man would exercise under the same circumstances, before buying and paying for the tax bills. McNeal inquired of the Standard Paving Company as to the issuance of the special tax bills and coupons to it, and of the sale by the Standard Paving Company to the Hanchett Bond Company. He also inquired at the office of the commissioner of finance and revenue of the city of Tulsa as to whether or not the special tax bills and coupons were outstanding, and by whom they were owned. He was advised that the Hanchett Bond Company of Chicago held said special tax bills and coupons, and that since the sale by the Standard Paving Company the Commissioner of finance and revenue had paid the funds

collected, by reason of the tax bills and coupons, to the Hanchett Bond Company, upon the surrender to him of the coupons.

It appears from the evidence after the purchase of the special tax bills and coupons that McNeal notified the commissioner of finance and revenue of the city of Tulsa that he had purchased the special tax bills and coupons, and was the owner thereof, and that collections thereof were to be paid to him. The special tax bills and coupons in question were indorsed in blank by the Standard Paving Company. No other assignment restricted or otherwise appeared on the special tax bills and coupons. Nothing evidenced any interest of the Fidelity National Bank & Trust Company in them. Under such circumstances, McNeal is a bona fide purchaser for value of said special tax bills and coupons, without notice of the claim of the Fidelity National Bank & Trust Company.

The plaintiff's witness Walter, while testifying with reference to the so-called trust receipt, testified that the Fidelity National Bank & Trust Company made no inquiry of the disposition to be made by the Municipal Securities Corporation of the said special tax bills and coupons, and that the Municipal Securities Corporation simply made collection and sent the money or posted other collateral, and that the Fidelity National Bank & Trust Company simply left it to the option of the Municipal Securities Corporation of Chicago, to either send money or substitute other collateral for the withdrawal of special tax bills and coupons. The witness further testified with reference to the purposes for which the special tax bills and coupons were withdrawn, that whether it was for sale or collection, it meant the same where the Municipal Securities Corporation was concerned, and that the primary purpose for taking down the collateral was to get them out of the hands of the trustee to get the money upon them. The plaintiff's witness Huett corroborated witness Walter, with reference to the inquiry made of the trustee or the steps taken by the trustee at the time of the withdrawal of the said special tax bills and coupons. The fact that the collateral supporting the bonds sold to the public was being given and turned over to the debtor appeared to be of no importance to the trustee. Upon the whole, under all the facts and circumstances of the case, this court must conclude that the underlying collateral of the municipal securities investment gold bonds was tossed about in a manner most conducive to the wishes and interest of the debtor.

Interpreting the withdrawal of the coupons in question, by the Municipal Securities corporation of Chicago from the trustee, in the light of the trust receipt, the above indenture of trust, the testimony of the plaintiff's witnesses, and the conduct of the parties, and the condition of the special tax bills and coupons in question, I am of the opinion that the plaintiff should be denied the relief sought.

The Municipal Securities Corporation of Chicago acquired the special tax bills and coupons in question from the trustee with the power to deal with them in the manner in which they were used, and was vested with the ostensible evidence of title, in order that it might exchange the special tax bills and coupons for cash and remit to the trustee, or substitute other collateral therefor. With such power in the Municipal Securities Corporation of Chicago, McNeal acquired title by his purchase. Rasekranz v. Guaranty Trust Company, 295 P. 487. The rule finds support in many authorities, that when the owner of property clothes another with the apparent title or power of disposition, and third parties deal in good faith with him, they should be protected. McNeil v. Tenth National Bank, 46 N. Y. 325, 7 Am. Rep. 341; Talty v. Freedman's Savings & Trust Company, 93 U. S. 321–326, 23 L. Ed. 886; Cowdrey v. Vandenburgh, 101 U. S. 572, 25 L. Ed. 923; National Safe Deposit, Savings & Trust Company v. Hibbs, 229 U. S. 391, 33 S. Ct. 818, 57 L. Ed. 1241.

For a well-reasoned case, see Russell v. American Bell Telephone Company, 180 Mass. 467, 62 N. E. 751, opinion by Holmes, C. J.

The failure of the Municipal Securities Corporation of Chicago to remit the cash or to substitute other securities for the withdrawn special tax bills and coupons was a breach of trust of which McNeal could have had no notice.

The power of substitution and the authority of the Municipal Securities Corporation of Chicago to collect the coupons in question, and to maintain suits thereon, with the duty of holding the proceeds in trust, as defined in the indenture of trust, relieved the commissioner of finance and revenue of the city of Tulsa, or a purchaser of the Municipal Securities Corporation of Chicago, of the necessity to see to the application of the proceeds of said special tax bills and coupons, even though they might have known of the trust relationship. Perry on Trust and Trustees (7th Ed.) §§ 594, 1353.

McNeal was a bona fide purchaser of said special tax bills and coupons for an adequate valuable consideration without any notice of the alleged claim of the trustee. In such circumstances, and under the further circumstance that both the Municipal Securities Corporation of Chicago and the Fidelity National Bank & Trust Company of Kansas City sought to keep the special tax bills and coupons in question in as negotiable condition as possible for the purpose of the trust indenture, McNeal took title. Cowdrey v. Vandenburgh, 101 U. S. 572, 25 L. Ed. 923; Laughlin v. District of Columbia, 116 U. S. 485, 6 S. Ct. 472, 29 L. Ed. 701; National Safe Deposit, Savings & Trust Company v. Hibbs, 229 U. S. 391, 33 S. Ct. 818, 57 L. Ed. 1241.

█ Nothing is clearer than that a purchaser for a valuable consideration without notice of a prior equity obtaining the legal title of the estate is entitled to priority in equity as well as in law, according to the well-known maxim, where equities are equal the law shall prevail. First National Bank v. Ferrell (1930) 142 Okl. 227, 286 P. 311. Also, see Perry on Trusts and Trustees (7th Ed.) § 218, page 382, and the many applicable cases therein cited.

In view of the conclusions herein reached, a court of equity should not exercise its power to rescue a plaintiff from the situation in which it has negligently placed itself.

Decree may be entered for defendant.